May it please the court, Anthony Colombo on behalf of petitioner-appellant Ricardo Ramirez-Marentes. The Fifth Amendment to the United States Constitution provides that no person shall be compelled in any case to be a witness against himself. When police ask questions of a suspect in custody without administering the required warnings, Miranda v. Arizona dictates that the answers received be presumed compelled and that they be excluded from evidence. Here, Mr. Ramirez-Marentes was in custody, subjected to police interrogation, and he should have at first been provided his Miranda rights prior to any interrogation. However, he was not. Any other determination is contrary to an unreasonable application of clearly established law. Assuming that he should have, that he was in custody from the beginning until he got his Miranda rights, what adverse to him came out during that period of time before he got his Miranda rights? In other words, why wouldn't it have been harmless?  In order for Miranda rights to be applicable, it's applicable to whether there's an admission, a confession, or any statement, whether it's innocuous. I'm assuming that there was a Miranda violation up to the point that he got it, but what came out of it? Well, during the pre-Miranda statement, I think that the most compelling piece of evidence was Mr. Ramirez-Marentes' admission that he hit Ximena, and that was used at trial. And in this particular case, the district attorney's office theory was that the child, Ximena, had been punched in the stomach several times, and Mr. Ramirez-Marentes admitted to that, and that was pre-the Miranda warning. Did he say he hit her in the pre-Miranda phase, or that she fell on his knee? And it could be that he hit her, I'm just trying to remember, I can't remember. No, in the pre-Miranda stage, initially he said she fell on his knee. However, towards the end of the two-and-a-half-hour pre-Miranda interrogation, he did admit and say, I hit her. And then subsequent to that, there was some follow-up questions, and then after they received that beachhead confession, that's when they took a break for ten minutes, and then went back and Mirandized him, and then rehashed everything that was said in the initial statement, and eliciting some further details. What do you mean they rehashed? Well, they went over some of the initial statement that was made pre-Miranda. They talked about some of the further details, and really just shore up the interview. I mean, the second interview was substantially shorter than the first pre-Miranda interview. However, Your Honor, when we're looking at harmless error, I think that, one, the government has waived that argument. They never raised that argument in their response at this level. In addition, Your Honor, a confession is the most persuasive evidence that can be admitted to trial, and that's pursuant to Arizona v. Fulminante. So I do think that if we're looking at the error, it would be considered a harmful error, because it was an admission, a confession. At least that's the way the district attorney's office approached it in this particular case. Let's talk about Missouri v. Siebert or Seibert. It was decided after the last state court decision in this case. So I think Green v. Fisher suggests that it is not clearly established law for purposes of our review. Can you please talk to me about that? Well, the first thing I would say is that the court doesn't need to consider Missouri v. Siebert to find that there was a coerced, well, an unwarned statement and coercion pursuant to due process and the Fifth Amendment and Miranda v. Arizona. So I don't even think that the court needs to consider Missouri v. Siebert to decide in the petitioner and appellant's favor. However, I would say in terms of considering Missouri v. Siebert, as the magistrate court noted, and that's excerpt of record volume 1 at page 44, note 22, the Siebert decision was rendered prior to when Mr. Ramirez-Marentes' conviction became final. So I do think that it is within the scope of the consideration here. Now, I would admit that the trial court did not have the benefit of the Missouri v. Siebert decision when it allowed the admission of Mr. Ramirez-Marentes' statement at trial. However, I do think that the trial court did have ELSTAD, and under ELSTAD the statement should not have been admitted because Mr. Ramirez-Marentes was in custody. He was not warned of his Miranda rights. He was interrogated for two and a half hours. And in my opinion, he was subjected to psychological ploys, many of them, as I outlined in my brief by the two detectives. So the initial statement was, in fact, coerced. And under ELSTAD, if an initial statement is coerced and the arresting agents then advise him of Miranda, the issue becomes whether that advisement is acceptable. When you say the statement was not coerced, I mean, we have to determine whether the state court's determination here was unreasonable or objectively unreasonable. So what's your best argument as to why it was coerced? Well, my best argument as to why it was coerced, Your Honor, is I think under a totality of the circumstances, you have to look at, first, the initial statement that was made was unwarned. The detectives made an intelligent decision to not warn Mr. Ramirez-Marentes of his Miranda rights. And this court has said in Thompson v. Reynolds that rarely, if ever, is there a legitimate reason for delaying Miranda warnings. But then setting that aside, Mr. Ramirez-Marentes was- I mean, you know the facts better than I do. And then he agreed to go and talk to them. And I guess they were also-the officers were also talking to the mother or tracking down the mother. So you're assuming that he was there without thinking that he could not leave? Well, yes. I'm not only assuming that. I think it's strongly supported by the record, Your Honor, because Officer Gomez told Mr. Ramirez-Marentes, we have some further questions for you. We'd like you to come down to the station house. Despite Mr. Ramirez-Marentes having his own transportation, he was put in the back of a squad car and taken there. He was then told by Officer Gomez- But he agreed to go. Well, he did, but at the police request. When he arrived at the station house, he was told by Officer Gomez to wait. He was told by an officer in uniform to wait. He did. He waited for an hour. Then after that hour, he was taken to a locked, small interrogation room, where he was then subjected to interrogation by Officers Duran and Renaud. And during that time, he was isolated from Sabrina, the infant who he was babysitting. He was isolated from Claudia, Jimenez's mother. He was isolated from his mother, despite asking several times to speak with his mother and also to speak to Claudia, the mother of the child. And he was isolated from the outside world in general. During that pre-Miranda statement, he was lied to concerning Jimenez's death. The officers clearly concluded his guilt. They viewed him as the number one suspect. They appealed to his conscience on a number of occasions. They minimized the moral seriousness of an offense. They ignored his repeated requests to speak to his mother. And they continued the interview even after he said he was physically ill. Do you have a case that you think best supports Bill? I think this is straight Miranda v. Arizona. If we look, the circumstances here are much more egregious than in Miranda and the three cases that were decided with Miranda, which is the Vignera v. New York, Westover v. United States, and California v. Stewart. In those series of cases, in the Miranda case, the Supreme Court recognized that there was an absence of physical and psychological ploys. And I'll quote Miranda. To be sure, the records do not evince overt physical coercion or patent psychological ploys. The fact remains that in none of these cases did the officers undertake to afford the appropriate safeguards at the outset of the interrogation to ensure that the statements were truly the product of free choice. So I think here, this is straight Miranda v. Arizona. This was an egregious practice by the detectives. They intentionally did it. They played Miranda in the middle, and the court should find in favor of the petitioner an appellant. And I would submit at this time, reserved for rebuttal. Thank you, Counsel. Good morning, Your Honors. Deputy Attorney General Jennifer Jadovitz, co-respondent in this case. I'll try to go in order of counsel's positions here. With respect to the alleged Miranda violation regarding custody, respondent would submit that Mr. Miranda was not in custody at this time and that the circumstances would support that finding as determined by the district court in this case. As Judge Morelga pointed out, he voluntarily came to the station. None of the questions were coercive or deceptive. The questioning was actually at that point conversational. And case law states that with respect to station house interviews, that does not necessarily deem the circumstances custodial. With respect to Judge Fisher's comments regarding harmless error, in respect to if you were to find that he was in custody and that there was an error at that point, under this particular circumstances, the statements that Mr. Miranda has made at that point were marginal compared to what he stated after the Miranda warnings were given. So, as pointed out... Marginal, but foundational. True. But while he said, and it is a little confusing, he said he hit her at one point before the warnings were given, but it was kind of unclear when he said that, did he just give an explanation that when he meant to say he hit her, because she fell on his knee when he was playing with her in the bedroom. So he was still essentially denying culpability for causing her injuries. With respect to the claim that... So you're arguing that the statement, he hit her, after they kept pressing him and pressing him, was ambiguous? Ambiguous to the extent that... On its face, not ambiguous, but again, he admits that he hit her, but he's denying culpability for causing her injuries, because what he talks about... Well, I saw the tape, and I just responded to your characterization of it. Correct. But when he's saying he hit her, what he means is he hit her because she fell on his knees when he was playing with her. So it was a qualifying admission, if you will. So you're saying when he said he hit her, he didn't mean he actually hit her, she hit his knee. Correct. You think that's what he said? That's a fair explanation of his statement. Is that how the state argued it to the jury? I can't say for sure, Your Honor. Would they likely have? I think that they would have potentially argued that that's a possibility, and that was his explanation for how she sustained her injuries. Well, counsel says that statement was argued to the jury. You don't know? I know that it was argued to the jury, but the way that it would have been argued to the jury, is that his explanation for how she sustained his injury and how he's denying culpability for any purposeful conduct on his part. Well, if you don't know how the argument was made, I don't think that's very helpful. As for the... The counsel says you waived, the state hasn't raised her, has there? And I would disagree with that, Your Honor. With respect to, in arguing that the district court properly denied this claim and that the state court reasonably rejected the claim, the district court did discuss harmless error. We adopted the district court's argument, so I would disagree that we've waived the harmless error argument as to that particular issue. With respect to the delay of the Miranda warnings, I think, as Judge McGaugh pointed out, is that Siebert does not apply in this case, under Green v. Fisher, and it's not the finality of the case in state court that we're concerned about. It was what decisions were decided by the U.S. Supreme Court at the time the state court denied these issues. And since Siebert was decided after that, it does not apply under Green v. Fisher. It would be LSTAT that controls in this situation, and because none of the statements were involuntary before or after the Miranda warnings were given, then there's simply no violation in this case. Your brief doesn't do much more than explain to the court the basis for the district court's decision here. Why shouldn't we conclude that when we were reviewing this Missouri v. Siebert issue, and whether it applies, that you didn't waive it? I mean, you failed to waive any contrary argument in your brief. How is it not waived? That was not our intent, Your Honor, and I would specifically state here today that we do not expressly waive that argument, and we would stand. You're familiar with our court rules that if you don't raise it in the briefs, it's waived. It's not your question of your uncommunicated intent to somehow give you leave to resurrect an oral argument. And to that extent that we did not make that clear, Your Honor, respectfully we apologize, but that is not our intent, is to waive this argument. I want to understand, what is your argument then? What's your best argument on Missouri v. Siebert? That it does not apply in this particular situation, as the district court found because it was not final at the time the state court decided the issue. Well, let's suppose the district court is wrong. So where are you if you assume that Siebert was, for this case, clearly established? I think because no state court has found any deliberate actions by the officers in this case that Elstad still applies. There was no deliberate. There's nothing in the record to show that the officers intentionally or deliberately delayed Miranda. The state court didn't make that finding. The district court didn't make that finding. So once again, it simply doesn't apply, and under this court's decision, I believe it's in Williams, we are under Elstad in this case. And so Elstad doesn't apply. What's your argument then? I'm sorry, Elstad does apply. Elstad does apply, and there was no deliberate delay. Then because both the pre-warning statements were voluntary and the post-warning statements were voluntary, there's just simply no violation in this case. You heard Mr. Colombo argue why they weren't voluntary. Tell me why you think they were voluntary. Because the overall reaching argument in this case is that there's a due process violation because the statements were involuntary. But as the state court found in this case, it's simply not the case. The video in particular is dispositive of this issue with respect to there's no evidence that there was coercion, deception, threats, promises of leniencies by the officers. There's nothing to show that Mr. Marentes' will was overcome in this situation. As the state court pointed out in deciding this issue, Mr. Marentes held his own with the officers. He answered the questions. It was more conversational with the officers. There was no overbearing conduct by the officers. And basically, as the state court said, he bobbed and weaved the best he could, but then he decided to come clean. Unless the court has any further questions at this time, respondent would submit. Thank you, counsel. We'll give you two minutes for rebuttal. Okay, thank you, Your Honor. I appreciate that. The first thing I'd just like to address is in terms of deliberateness because I didn't address that before. These two detectives were trained on interrogation techniques. In regard to Detective Reneau, he had conducted 200-plus interrogations. These interrogation techniques were very common techniques that were used on Mr. Marentes. This is all according to their testimony. This two-step technique was popular at the time during this interrogation, which was in 2000, and that's pursuant to United States v. Carrasco-Rios. It's 587 F sub 2nd, 1089. It's cited in my opening brief on page 40. But most importantly, the detectives had a preprinted Miranda warning form in Spanish at the outset of their interrogation, and that's Excerpt of Rascard, Volume 2, page 305. So there is this deliberateness. They intended to get a beachhead admission, which was unwarned, and then warn him and then just go over the same admission or confession, and that's what happened in this particular case. Well, they didn't get the statement, and when they went back, they didn't ask him. If all they've done after the Miranda warning is go back and then essentially recapture damaging statements made before, I think you would make a legitimate argument. But the problem I'm having, counsel, is that he made a statement. There was time that passed after that. But then when they gave him the Miranda warning, they pursued the line of inquiry. As I put it to counsel for the State, it was the admission that he made in the pre-Miranda period was foundational, and then they took that and had him eventually, he wound up elaborating and ultimately confessing. So what Elstad type of case have you got that is the closest to your fact situation? Well, I would agree with your honest characterization in regards to how the interview occurred. I would say in looking at the circumstances in Thompson v. Runnell, I think the circumstances are exactly the same as in that case. You have a pre-warning interrogation that was confrontational and detailed. The two sessions took place in the same small interrogation room, back to back, with little or no break, in this case 10 minutes. The police personnel were exactly the same, and the officers treated the two sessions as continuous as the pre-Miranda statements or the earlier unwarned statements were used during the second post-Miranda interview. And the most important thing here is that there were no curative steps that were taken between these two particular interviews, between the unwarned and the warned. And what this goes to is whether or not the individual could knowingly, intelligently, and voluntarily at that point exercise his right to remain silent. And he couldn't at this particular circumstance. And I would just like to leave the Court with this closing remark, because I know I'm over my time, and this is from Miranda v. Arizona. We sometimes forget how long it has taken to establish the privilege against self-incrimination, the sources from which it came, and the fervor for which it was defended. I think in this particular case, Your Honors, it was a clear violation of Miranda v. Arizona, of Mr. Ramirez-Marentes' due process rights, and he deserves a fair trial. We would ask to find for the petitioner an appellant in this case. Thank you. Thank you, Counsel. The case just argued is submitted. The next case, Abraham Mian, is submitted on the briefs. The next case for oral argument is United States v. Rubio. Thank you for your arguments, Counsel. Good morning, Your Honors. Catherine Young from the Federal Public Defender's Office for the appellant Nicholas Rubio. Your Honors, Mr. Rubio is here challenging his 85-month sentence for conspiracy to commit bank fraud. Just to summarize what happened in the offense, the co-conspirators washed checks, they opened accounts with false identification, deposited the checks, and then withdrew the proceeds. Now, the declaration by the Inspector General in support of the complaint in this case tells us that one of the most common ways to cash checks is to wash them. It also says the defendants often use false names and false identification. So we know that the type of offense in this case is common and usual. But what is not common and usual is the fact that the defendants in this case took absolutely no effort to avoid detection. They used their own addresses for the checking accounts. They also purchased items which were registered to them at their own addresses. For example, a car. Mr. Rubio lived at a fledgling business he was establishing, and he used one of the checks to purchase items for that business. So in other words, no efforts were made to escape detection, and in fact, law enforcement identified them within a month after some of these fraudulent accounts were opened. A month and $800,000 later. Well, I'm not quite sure what happened. They were at the residence within a month, but then the inspectors just left and said, well, call us if they show up again. And they got a call about a month later. They're here. By the time the inspector got the call and called back, they'd gone. A month later, they get another call. They're back. The inspector again calls. By the time he gets there, they're gone. And I'm not quite sure. So they were waiting for other people to do the investigation for them, but they actually had their eyes on one of the defendants within a month. They could have pursued it, but they were letting other people do the work for them. But with that in mind, with what happened, with the extent of the conspiracy in mind, I want to turn to the enhancement for sophisticated means, which requires especially complex or especially intricate offense conduct. And the application note talks about conduct such as hiding assets or transactions. And sophisticated means is a two-level increase. Is that right? It is a two-level increase, Your Honor. So it's the base offense level and then the amount of loss, which gave him the biggest bump. Is that right? Yes, Your Honor. I don't know. Was it $397,000? Yes. But actually he got for it. I'm sorry to interrupt you. That was the actual loss. He got intended loss of $800,000. Sorry. That gave him the biggest bump from the base offense level. Yes, Your Honor. So what you're arguing here is the sophisticated means. Yes, Your Honor. That's a two-level increase. And then we review for abuse of discretion. Is that right? Well, on this case, Your Honor, since there was no objection, it's for plain error. I'm sorry. That's right. So give me your best argument for plain error here on the sophisticated means. Well, I'll go over what if, in fact, the court finds that there's error, then since there's an error in the guidelines calculation, that becomes plain error. And so I'm focusing on the fact that there was, in fact, error based on the cases, the guideline itself, the legislative history of the guideline that's cited in our briefs, and also just the nature of the offense. So what we're talking about is –  I'm sorry, Your Honor. Would have been guiding the district court. Are you familiar with United States v. Tanking? I'm not sure, Your Honor. Well, it's too bad. I wrote it. Sorry, Your Honor. 743 F. 3rd, 1296. Pages 1307 to 08, Ninth Circuit, 2014. Okay. I apologize, Your Honor. Well, okay. Maybe it's plain error. Sorry. I'm sorry, Your Honor. So I wanted to focus on the fact that the – Sorry. Yeah, never mind. The offense requires not just complex or intricate conduct, but especially complex or especially intricate conduct. And this court has said in the EGLE case cited in our briefs that it must be sufficiently more complex than a routine offense. In that case, the defendant had opened up new credit accounts using personal identifiers which he had gotten through a business. He had fraudulently purchased goods delivered to upscale vacant homes in order to avoid detection and made bursts of purchases before the accounts were shut down. So in other words, he made an effort. He used upscale vacant homes for the items that he was purchasing. He made an effort to avoid detection. Now, we talked in the briefs about the Sentencing Commission history. And the Sentencing Commission said that the purpose of the enhancement is to involve conduct such as sophisticated concealment that makes it difficult for law enforcement authorities to discover the offense or apprehend the offender. And several times they reiterate that thought, that the focus of the offense is that it makes it difficult for law enforcement to detect or apprehend. And again, further on, the Sentencing Commission says, the third prong involves an increase if any offense covered by the fraud guideline otherwise involves sophisticated concealment. This prong addresses cases in which deliberate steps are taken to make the offense or its extent difficult to detect. In other words, the focus, according to the Sentencing Commission, of this guideline is, do the defendants try to make the offense difficult to detect or difficult for the defendants to be apprehended? And that's exactly what the defendants in this case did not do. Maybe we can move on to another issue. Yes, Your Honor. I'd like to ask you a couple of questions on the restitution and the arguments you make regarding restitution. Again, we're looking at this for plain air on whether or not the district court considered the defendant's inability to pay. Can you talk to me a little bit about that? And specifically, I'd like to talk about it in light of Bergram and what that tells us we need to do. Because you argue that the court did this in aggravating his sentence or as an aggravating factor. Yes, Your Honor. And you cite, I think, Bergram in support of that. But in Bergram, the district court there made an explicit statement saying, I'm going to do this as an aggravating factor. We don't have that in this case, but I'm still intrigued by your argument. So can you give me your best argument as to why we would distinguish Bergram or why this is similar to Bergram? Yes. Especially in light of Rangel as well. Thank you, Your Honor. Well, I think that it depends. The district court says, I'm looking at the harm he's done to people. I don't think the money will ever get repaid. In other words, he's saying, I'm focusing on the fact that these people are harmed and they're not going to get repaid, which is the Bergram issue of the fact that the district court is focusing on it as an aggravating factor. The court then says, I'm really leaning towards the upper end of the guidelines. He has done some damage. In other words, the district court, in a sense, you may not have the explicit statement that you had in Bergram, but the district court is saying, this money isn't going to get repaid. He's done some harm. And then the district court says, I'm leaning towards the upper end because he has done so much damage. Well, you're kind of conflating the transcript. I've got it in front of me. Sorry, Your Honor. Maybe it would be helpful. I have the same question as Judge McGill. Certainly, Your Honor. Okay. I wrote Bergram. I want to be careful we don't over-apply it or under-apply it. No, I understand. Thank you, Your Honor. Okay. So on page 18, he says, I'm looking at the harm that he has done to people. And I don't think any of this money will ever get repaid. I really don't. Okay, now let's stop right there. Thank you. The PSR says, on victim impact, Chase Bank suffered a total actual loss of $397,595. The probation officer has not received information that any actual individual or legitimate business suffered a loss as a result of the conspiracy. So who are the people that Judge Wright was referring to? I assume he means the people at Chase Bank. Okay. And I don't think any of this money will ever get repaid. And so you're suggesting that the people at Chase Bank were the ones that were harmed, individuals? Well, I think you're right, Your Honor. Chase must have covered the loss because that's what the PSR says. So when the court is making this statement, it's referring to the only people it can be referring to are Chase, unless there's some information that's not in the record that Chase was going after the individual account holders. So the only reference that you're extracting from this is the bank, and it's the bank who won't get repaid. Yes, I think that's their reasonable interpretation of that. But then in the next page, the court says, I'm leaning towards the upper end of the guidelines. I really am. No, he says a lot more. He says it's now, you know, he talks about supervised release. And then he says, and then he comes back to it and says, for a number of reasons, I'm really leaning toward the upper end of the guidelines. I really am. He has done some damage here to people. And I wish it could have been for a good reason. And then he goes on and talks about his views about how the money was spent. And the reason I'm confused here is that he seems to be talking as if real people, individuals, not an institution, had been injured. And it is appropriate to consider the impact or the harm. That's what Rangel says. So I'm trying to find out, in your view, where does this fall in the question Judge McGee opposed? Where is this in the spectrum between Burgum and Rangel? Now, I understand what Your Honor is asking. But we're talking about a bank. And my interpretation of it is that he's focusing on the fact that he was offended by the fact that he thought this money had been spent on frivolity and therefore wasn't available to be repaid. And therefore, he was focusing on the fact that the money would not be repaid. Restitution would not be made for the crimes that had been committed. All right. And I think I'm over my time, so unless there are any questions. Thank you. May it please the Court, Robin Bacon on behalf of the United States. I'll turn first to the issue of restitution and offer at least an alternative perspective, one that is reflected in the government's sentencing position. And I think there's definitely evidence in the record to support that this was a consideration for the district court. There are, in some ways, two sets of victims in this case. Chase Bank that suffered the loss. And Chase suffered $397,000 worth of actual loss. But the reason that Chase Bank suffered that loss is that defendant's scheme, and if time permits me, I'm happy to correct the factual errors regarding the sophistication of defendant's scheme. But defendant's scheme involved taking checks that businesses and individuals were using as part of their attempts to conduct their ordinary course of business, stealing them, altering the payment information, and then depositing them in fake business accounts. What that means in terms of its impact on people is that these businesses, and these are primarily small local businesses or individuals dealing with brokerage accounts, people who are trusting the mails and the financial system to conduct their business, were disrupted in ways that often can cause a great deal of harm. If you're writing a check to a supplier and you're a tool company and that check is never delivered, that can have repercussions for you, even if the bank absorbs the financials. Is there any evidence that that happened, or is that just theoretical that it could have happened but didn't? Well, it's discussed in the complaint, Your Honor, the fact that this case began with victims complaining about the fact that their checks weren't being delivered and that they were, as a result, having their own issues in trying to find out what had happened to attempted payments. Well, it's in the complaint, but is there any evidence that those victims actually suffered? Well, I think it's a difference between evidence of financial loss, which there is no evidence that they suffered financial loss. It does appear that the bank did make the victims whole, but it's certainly not beyond the pale for the court to take into consideration the fact that this is not just a cold-blooded transaction between an individual and a bank, but that there were intermediary steps. And when he speaks of the harm that was caused, there was certainly information included in the government sentencing position that it was appropriate for the court to remember that there were people attached to each one of these checks the defendant stole. Well, it says, I'm looking at the harm he has done to people, and I don't think any of this money will ever get repaid. Well, and there, that statement does not actually match the restitution position in the case. And I think it's worth keeping in mind, especially when you look at the length of the transcript and the fact that this is a judge who does tend to think out loud that this was a point of processing the information. He did say, I really don't, when he really means it. And then the other quote we heard, he said the same thing, I really do believe this, meaning I assume the other things he really doesn't believe. I think if you look at the transcript as a whole and the hearing as a whole, what you see is the court unambiguously understands that Chase suffered the financial loss. Chase is the only identified victim for restitution. And what does he mean when he says, I think people are simply going to be out of hundreds of thousands of dollars? He's referring to Chase? I think in that particular sentence, he would have to be referring to Chase, because Chase was the only loss, but I think more, it becomes clear when you look at his second thought, when he's discussing the impact of the crime and the seriousness of the offense. And that's the part where he says he's done a lot of damage to people. There it's not specifically pegged to the issue of how much financial loss, but just the harm that was caused. Well, that follows right out. I mean, the counsel was conflating. I mean, not accusing her of anything wrong, but she was taking his two relevant statements. But he shifts into supervised release, and then he comes back. So I think at least what we're looking at, were you the trial counsel? I was. Okay. So in his thinking out loud, was he just extrapolating some larger record there? It seemed to me he's talking about what he said on ER 18, on ER 19. He's talking about the losses to people. I do believe that the district court was taking into consideration sort of two components of harm caused here. And that one sentence, these people are going to be out of money, I think that was the court in some ways conflating them. But in further thought, separating the two thoughts again. So on the one hand, there are the actual people whose lives were disrupted, and that is perfectly appropriate when thinking about the magnitude of the events. He's not talking about disruptions. He's talking about money. I'm looking at the harm he has done to people, and I don't think any of this money will ever get repaid. It comes across as somebody, as in Burgum, who was saying, you know, a lot of people lost money that he's not going to be able to repay. And then expressly said it was an aggravating factor. And so that's why it's troublesome because it sounds like to him when he says, for a number of reasons I'm leaning toward the upper end of the guidelines, unreimbursed dollars is because of this guy's situation isn't going to cause me to go up a bit. Well, and I think that that is a conclusion that you could draw from the line about people being harmed and they're not going to be repaid. But I think also that if you look at where the court went in its thinking, this is what I mean when I say the court has a tendency to think out loud, that at that particular stage we have a comment that actually just doesn't match the facts of the case. But a moment later he begins to parse out the components of it more clearly. And at that point it becomes more clear that the harm is both the financial loss but also that the harm was done to actual people. Where in the transcript, what part of the transcript are you relying on for that statement? I'm referring to the second comment after the supervised release when he says you've done a lot of damage to people leading into the and it would be different if it had been for a good purpose. What page is that? Sorry, I don't have it. 19. Thank you. I appreciate that. He says he's talking about the money. When I look at these receipts of things he has purchased with this money. Yes, but it's not inappropriate for the court to look at how the money was used in considering a sentence in a fraud case. I understand that. I'm just trying to understand how you move this from Burgum to Wrangell. Oh, absolutely, Your Honor. I think this case falls in between. And I believe that Burgum, we have a situation where the district court, when it was enumerating the considerations under 3553A, specifically identified the inability to pay restitution as an aggravating factor. And it was an isolated comment, but it was also a very clear comment that that was one of the considerations that the court was using in determining what was an appropriate sentence under 3553A. And then you have a situation closer to Wrangell, which is not the situation here where it is, again, entirely appropriate when you have individual victims with financial loss for the district court to consider the fact that individual people would not be made whole. And we're falling somewhere in between. And this court has actually established a two-part consideration when looking at these kinds of restitution comments, I think, in reflection of that tension. So here we do have an institutional victim, and we do have a comment that he will not be able to, that that money won't be repaid. Though, notably, unlike Burgum, that comment was not focused on defendants' inability to be paid. It was more a reflection on the fact that this damage has occurred and it will not be corrected. Burgum, it was a much more explicit, you can't even pay a fine, you're never going to be able to pay back the restitution. I think that's a consideration here. I mean, we're getting into subtleties, but this is a subtle analysis. We don't have any explicit consideration of restitution as an aggravating factor. In fact, when the court imposed sentence, the aggravating factors the court identified had more to do with defendants' criminal history and the fact that he had prior offenses of a somewhat similar nature. And if you look at the record as a whole, the aggravating considerations that the court spent its time on had more to do with the reasons for the offense and the skill involved in executing the offense than in defendants' financial position, which was actually never explicitly discussed except in mitigation when the court was imposing sentence and when reflecting on the history and characteristics of the defendant noted that he had grown up in poverty but had, in fact, had education and gotten a job and played soccer, all taking into consideration defendants' history. But at that point, which would have been in the Burgum context when he might have mentioned his inability to pay, there was no reference to restitution or making the bank whole at all. And I think that falling in between here when we have an at best ambiguous comment, especially given the gap between that one comment and the facts, that the court clearly understood, because, again, the record's clear. The court knew who the financial victim was, but also understood the nature of the offense, that in that situation, I mean, as this court has found, it's appropriate to presume that the court was acting lawfully and certainly without any explicit statement that this was an aggravating factor or a reason for the sentence imposed, then it seems that there's no indication of error. I think tellingly, although the court said many times he was leaning towards the high end of the guidelines, he actually ended up coming in in the mid-range, and that was after consideration of this restitution issue as well as consideration of the harm the defendant had done. I see that I'm out of time, so unless the court has questions in particular about the case or the scheme, then the government will submit. Thank you, counsel. Thank you. Thank you. Are you out of time, or you just... I was out of time. Do you want a minute? Okay, thank you. Thank you, Your Honor. Just briefly, one of the things I wanted to respond to is that the prosecutor said that the defendant stole the checks, and there's no indication of that. The evidence is that they took checks that had been stolen by someone else, and my client said that he was acting under the direction of another person. Then I also wanted to point out that with respect to the prosecutor was focusing on the... The court may have been referring to the inconvenience to the people from whom the checks were stolen, and I was briefly looking through the record, and I didn't see any reference to that in the sentencing papers or at the hearing, discussion of the inconvenience. I think the court was referring to monetary issues, which is in the purview of Bergam. If there are any other... Unless there are any other questions, then I'll submit. Thank you, counsel. Thank you. The case, it's argued, will be submitted.
judges: REINHARDT, FISHER, MURGUIA